In re Estate of Wanda Krumwiede, Deceased.
Jeremy Krumwiede, Personal Representative of the
Estate of Wanda Krumwiede, Deceased, Appellee, v.
Wilhelm Krumwiede, former Personal Representative
of the Estate of Wanda Krumwiede,
Deceased, Appellant.

647 N.W.2d 625

Filed July 19, 2002. No. S-01-730.

David A. Domina and James F. Cann, of Domina Law, P.C., for appellant.

John D. Feller and Sam Houston, of Feller & Houston, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

Wilhelm Krumwiede petitioned the Burt County Court pursuant to Neb. Rev. Stat. § 30-2207 (Reissue 1995) to declare his wife, Wanda Krumwiede, legally dead and appoint him as personal representative of Wanda's estate. After Wilhelm was informally appointed, Jeremy Krumwiede, son of Wanda and Wilhelm, filed an objection pursuant to Neb. Rev. Stat. § 30-2354 (Reissue 1995), which is Nebraska's homicide probate statute. Determining that Wilhelm intentionally and feloniously killed Wanda, the court removed Wilhelm as personal representative and appointed Jeremy as successor personal representative. Wilhelm appealed, and we moved the case to our docket pursuant to our authority to regulate the caseloads of this court and the Nebraska Court of Appeals. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## FACTUAL BACKGROUND

Wanda Krumwiede was last seen alive on Tuesday, June 13, 1995, between 8:30 and 9 p.m., walking through her neighborhood in Lyons, Nebraska.

In December 1994, 6 months prior to her disappearance, Wanda had filed for divorce from Wilhelm after over 20 years of marriage. The couple had two children of the marriage, Jacinda Romano and Jeremy, and a son, Jarrod Krumwiede, who was born to Wanda from a previous marriage and adopted by Wilhelm. At the time of Wanda's disappearance, Wilhelm had moved out of the couple's home in Lyons and was living nearby. Wanda was living in the home and renting out a portion of the residence to a lodger.

On June 13, 1995, Wanda worked her normal shift at the Safeco Market and had lunch with her sisters. Wanda told her sisters that she was looking forward to babysitting Jarrod's two young sons that weekend and that she was excited that

Jacinda was going to have a new baby. At about 7 p.m., Wanda called Jarrod from her home and spoke with him about the upcoming visit.

The next day, June 14, 1995, was Wanda's regular day off from work. Jeremy telephoned Wanda at home but was unable to reach her. He became concerned and called Jacinda. On June 15, Wanda did not show up for work. Jacinda eventually contacted Wanda's sister, Mardelle Connealy, on Friday, June 16, and asked her to check on Wanda. Mardelle and her husband went to Wanda's home that same day. They found both of Wanda's vehicles in the garage. There was no sign of a disturbance at the house, and Wanda was not there.

Law enforcement officials conducted an investigation, but Wanda was never located, nor was a body ever discovered. Based on evidence uncovered during the investigation, Wilhelm was charged with first degree murder.

Wilhelm's first trial in 1997 ended in a mistrial. The mistrial was granted prior to the State's completing its case in chief. The basis for the mistrial was Wilhelm's allegation that the State had failed to disclose certain photographs during pretrial discovery. A second trial on the first degree murder charge commenced in 1998. At the close of the State's evidence, Wilhelm made a motion for a directed verdict. The court sustained the motion, finding that "[t]he evidence adduced by the State against the Defendant is insufficient as a matter of law to permit submission of First Degree murder or lesser-included offenses to the jury" and, further, that "[t]he Information filed against the Defendant, including all lesser-included offenses, is dismissed with prejudice, and the Defendant is acquitted." The court did not set forth specific findings in support of its directed verdict.

On June 28, 2000, Wilhelm filed a petition for informal probate seeking appointment as personal representative and a determination of Wanda's death pursuant to § 30-2207(3). Wilhelm was informally appointed as personal representative on July 18. Thereafter, Jeremy filed an objection to the appointment, asserting that under § 30-2354, Wilhelm was not entitled to appointment or to any benefits from Wanda's estate. Section 30-2354 states in relevant part:

(a) A surviving spouse, heir or devisee who feloniously and intentionally kills or aids and abets the killing of the decedent is not entitled to any benefits under the will or under this article . . . .

. . . .

(e) A final judgment of conviction of felonious and intentional killing or aiding and abetting therein is conclusive for purposes of this section. In the absence of a conviction of felonious and intentional killing or aiding and abetting therein, the court may determine by a preponderance of evidence whether the killing or aiding and abetting therein was felonious and intentional for purposes of this section.

A hearing was held on Jeremy's objection in May 2001. The evidence presented at the hearing consisted of numerous exhibits, the testimony of several witnesses, and the record of the proceedings from the 1997 criminal trial. A number of witnesses testified at the 1997 criminal trial. We recount only that portion of the testimony from the various witnesses which is most salient for purposes of this appeal.

Jeremy's 1997 testimony disclosed that on June 12, 1995, the day before Wanda's disappearance, she took him out to dinner and shopping and that they had had a pleasant time:

[Jeremy:] If anything, she was happier than she usually is.

Q Did you have any indication that she might leave?

A None at all.

Q Did you have any idea that you would never see her again?

A None at all.

Q Jeremy, do you believe your mother would just up and leave without telling anybody?

A There's no way she would have done that.

Q And why do you say that?

A She loved us.

Q What things were important to your mother?

. . . .

[Jeremy:] Her family was very important to her, especially through the time that she was going through. She wanted us to be happy.

Q Had she ever taken off without notice before?

A No.

. . . .

Q Has your mother ever taken any kind of extended trip without letting you know where she was going?

A Never. We always knew where she was at. We always knew where we could find her.

Jarrod's 1997 testimony also showed that Wanda seemed happy when she talked with him the evening of June 13, 1995, about the upcoming visit with her two grandsons and that she gave no indication that she might leave. Jarrod further stated that Wanda would not leave without telling anyone because "She was — She was too close to us. She — not me, but the whole family, her grandkids. She wouldn't have left."

Jacinda also testified at the 1997 trial. She said that she and Wanda would talk on the telephone at least twice a week and see each other once every couple of weeks. She described Wanda as "a very good grandmother. She was very close, very doting." Jacinda testified that Wanda would not leave without telling her friends and family because "She just always was considerate. She wanted people to know where she was. If one of us kids were to look for her, we would know where she was."

Joey Brehmer, one of Wanda's neighbors, testified at the 1997 trial that he saw Wilhelm between 6 and 8 p.m. on June 13, 1995, running down the street in a direction away from Wanda's house. Brehmer was mowing his grass at the time. Brehmer stated that he noticed Wilhelm was wearing normal work clothes, not a jogging suit. As Brehmer watched, Wilhelm stopped and walked for a bit, then started running again. Brehmer had never seen Wilhelm run previously.

Cheryl Huffman testified that she worked as a postal clerk at the Lyons post office. She stated that she had known Wanda all her life. She said she saw Wanda on June 13, 1995, between 8:30 and 9 p.m., walking by Burlington Park in Lyons. Huffman was driving out of town with her husband when she saw Wanda and waved to her. Wanda waved back.

Brenda Wheaton testified at the 1997 trial that she was a resident of Lyons and that around 8:30 on the evening of Thursday, June 15, 1995, she was in downtown Lyons and drove through

dark smoke coming across Main Street. She was concerned that something might be on fire, so she drove around the block to see if she could locate the source of the smoke. She observed the smoke coming from the smokestack of Wilhelm's shop. Wilhelm, a self-employed carpenter, used the shop for his work. The shop was a "quonset" building with a wood-burning furnace-type heating stove in the center. As Wheaton drove by the shop, she saw Wilhelm get into his truck, then get out and go back into the building. She further testified that she had lived in the community for over 30 years and had never seen "any burning or smoke" coming from Wilhelm's shop in the summertime, noting that June 15 was a warm day.

Lyons police officer James Buck also testified at the 1997 trial. He stated that he saw smoke coming from Wilhelm's shop around midnight on June 15, 1995.

Investigator Bruce Motley, a law enforcement officer involved in the investigation of Wanda's disappearance, testified at the 1997 trial that on June 23, 1995, he and other officers searched Wilhelm's shop, including the contents of the stove. After removing the ashes from the stove, Motley examined the stove's interior and discovered a piece of an eyeglass frame wedged inside the stove. The eyeglass piece was in a little groove or crack between the fire bricks, about two-thirds of the distance between the back of the stove and the opening. There were also burned pieces of paper in the stove, some of which were identified by another investigator as the remains of a wedding announcement from the Krumwiede's 1969 wedding.

Mary Lauritzen's testimony at the 1997 trial revealed that she was the office manager for Family Vision Center in West Point, Nebraska. She testified that in August 1994, Wanda came in for a regular eye examination and was diagnosed as "need[ing] glasses." She further explained that because Wanda "hadn't worn glasses before" they "spent a lot of time talking about the type of lenses." Wanda then purchased a pair of "no-line bifocal" glasses, style No. GY 552, and color code 5079, for $340. Lauritzen stated that as far as she was aware, Wanda had never lost or damaged the glasses and, further, that the glasses were still under warranty in June 1995. The warranty provided that any broken parts would be replaced at no cost for 1 year.

Lauritzen also testified that the piece of eyeglass frame found in the stove of Wilhelm's shop was style No. GY 552. She indicated that they had sold only two sets of eyeglasses of this frame style, one to Wanda and one to another customer. Wanda purchased only one pair of glasses from Family Vision Center.

Wanda's sister Mardelle testified at the 1997 trial that she saw Wanda wearing these glasses on June 13, 1995. Several witnesses recognized pictures of the GY 552-style eyeglasses as the style Wanda wore.

Shelly Howard, a criminal analyst for the State of Nebraska, testified at the 1997 trial that her investigation determined only 25 pairs of GY 552 eyeglasses had been sold to consumers by the manufacturer. Of those 25 pairs, only 8 were color code 5079.

Dr. Reena Roy, a forensic serologist, testified at the 1997 trial that she examined Wilhelm's pickup for forensic evidence. She stated that her examination revealed small bloodstains on the exterior of the pickup around the driver's-side door and in the tailgate area on the lining of the interior of the "topper door." The stains were small, spatter-like drops or smears. In the area around the tailgate, DNA from the bloodstains in Wilhelm's pickup matched bloodstains contained on several pairs of women's underwear collected from the clothes hamper at Wanda's home. No DNA analysis was made of the bloodstains around the driver's-side door.

Officer Donald Shepherd's testimony at the 1997 trial disclosed that a person named "Nolan Lasovich" contacted law enforcement in the summer of 1995, stating that he had possibly seen Wanda on June 20, 1995, at a lounge in Council Bluffs, Iowa. Lasovich, who was thereafter shown a photographic lineup by Shepherd, identified two photographs as resembling the woman he saw on June 20. The first was a photograph of a female who was not Wanda. Regarding this photograph, Lasovich stated that the woman's hairstyle and facial features resembled the woman he saw on June 20. The second was a photograph of Wanda. With respect to this photograph, Lasovich indicated that the woman's hairstyle as depicted in the photograph resembled that of the woman he saw on June 20.

Linda Vetick, Wanda's hairdresser, testified at the 1997 trial. She stated that Wanda's hairstyle, prior to June 6, 1995, was full

and bouffant, with a lot of height or "poofiness." However, on June 6, Linda cut about 1½ to 2 inches of hair from the top of Wanda's head and trimmed the sides, generally changing Wanda's hairstyle to "really short and real wispy . . . that real modern, wispy look." The photograph of Wanda identified by Lasovich showed her with a bouffant hairstyle.

The State also called Don Slotsky, then-president of Northwestern Iowa Credit Bureaus, Inc., during the 1997 trial. Slotsky testified that his company was in the business of providing credit reports and processing check verifications. He explained that in 1997, he had been asked by the State to run a credit report for Wanda. He then proceeded to testify regarding the contents of the credit report. According to Slotsky, the report showed that Wanda had four lines of credit: First Card, Citibank, Bank One, and J.C. Penney Company. He testified that according to the credit report, there was no activity on any of the accounts after June 1995. The Citibank and First Card accounts were never used and were closed in 1996. The J.C. Penney account was shown as open but not active, with no balance owing. The Bank One account showed that the account was paid off in June 1995, and the account was closed.

Ray Earl Peterson, an acquaintance of Wilhelm and Wanda, testified at the probate hearing in 2001. He stated that his testimony at the probate hearing was consistent with his testimony in 1997 and 1998. Peterson related at the probate hearing that the Sunday prior to Wanda's disappearance, he spoke with Wilhelm after church about the upcoming divorce. Wilhelm told Peterson that the upcoming week was "property settlement week." However, the evidence showed that no proceedings regarding the divorce were scheduled for that week. Peterson described Wilhelm as "quite agitated" about the situation, saying with a clenched jaw that he "was going to make sure and not lose his house." Wilhelm's manner was intense enough that Peterson responded by telling Wilhelm "more or less" that " ' "No property is worth injuring anyone." ' "

Wilhelm also testified at the probate hearing and, in addition, offered his affidavit which was received into evidence. Regarding the fire in his shop, Wilhelm stated that on June 13, 1995, Wanda left a bag of trash in his pickup for him to burn. He

burned it in the shop stove that same day. He testified that Wanda would often leave mail and other items for him in his pickup, including any trash she wanted burned. He also testified that throughout the marriage, they had used the shop stove to burn personal papers and similar items.

Wilhelm further explained that on June 13, 1995, at around 5 p.m., he returned an automobile he had been using to its owner in Lyons and walked back to his shop. His walk took him to within a block of the family home. He stated that he walked for a while and jogged for a while because that "was my way of transportation to get back to my shop . . . I was running for exercise and was on my way back to the shop."

According to Wilhelm, he then returned to his shop and continued working until about 9 p.m. At 9 p.m., he went to see a friend, staying about 10 to 15 minutes. Wilhelm then drove to see another friend, but no one was home. Wilhelm then drove to his brother's home, arriving about 10 p.m. Wilhelm helped his brother change a tire on a tractor, which took at least 3 hours, then went to bed. On June 14, 1995, he awoke at approximately 6 a.m. and went into Lyons for breakfast. At approximately 9 a.m., he left for a jobsite in Winner, South Dakota, returning to Lyons the following day.

Wilhelm testified that he did not kill Wanda and that he had no idea as to her whereabouts.

Jeremy testified at the probate hearing. He said that he had often helped his father in the shop and had never seen his father burn any papers in the stove. Jeremy further stated that his father did not typically use the stove in the summertime.

On cross-examination, Jeremy acknowledged that he was aware that around 10 p.m. on June 13, 1995, someone observed an unknown vehicle in Wanda's driveway, occupied by two unknown men. Jeremy further acknowledged that Wanda had been diagnosed as an alcoholic in 1986, while hospitalized for an unrelated surgery. Jeremy stated that he had never seen Wanda take a drink after the diagnosis and that he had no explanation for the fact that beer was found in Wanda's refrigerator after she disappeared.

Mardelle also testified at the probate hearing. She stated that Wanda set out her trash every week at the curb, where it was

picked up by the city. She further agreed that Wanda had been diagnosed as an alcoholic in 1986 and that she had not seen Wanda take a drink since her diagnosis.

Among the exhibits received at the probate hearing was a receipt for the rental of a post office box in Wanda's name, signed by a postmaster with what appears to be the last name of "Webster." The receipt bears the stamp of the Lyons post office and is dated November 14, 1996. The receipt was also admitted at the 1997 trial. The foundation for admission of the receipt was provided by Huffman, a Lyons postal employee, who simply testified that the document was "a receipt for [a post office] box fee payment." No other evidence was offered at either the 1997 criminal trial or the probate proceedings regarding the circumstances surrounding the post office box receipt.

Slotsky again testified at the probate hearing. He reiterated and further explained his testimony concerning Wanda's credit card accounts based on his company's 1997 credit report. Slotsky explained the process used to obtain Wanda's credit information, stating that the 1997 report was drawn from a computer data bank located in Chicago and maintained by a company named "Trans Union." Slotsky further explained that the various "credit grantor[s]" provided information to Trans Union and that Trans Union then stored this information in its computer system. To produce Wanda's credit report, Slotsky drew the information from Trans Union's databank.

Slotsky testified that according to the 1997 report, Wanda's Bank One, Citibank, and First Card accounts were all marked "closed by consumer." He further testified that the Bank One account was "closed by consumer" in June 1995, while the First Card and Citibank accounts were closed in 1996, after Wanda's disappearance.

Slotsky stated that it appeared the Bank One account was a joint-contractual account with more than one authorized user, while the Citibank and First Card accounts appeared to be individual liability accounts, with Wanda as the only authorized user. However, he was not certain about this information, which was gleaned from letter codes contained in the 1997 report. He further stated that the Bank One account at one time had a balance of $11,000, which had been paid off. The Citibank and

First Card accounts were never used. When asked "whether anyone, other than Wanda Krumwiede would have been authorized to close these accounts," Slotsky responded "None of these accounts specifically state that there is joint liability on them. And therefore I cannot tell whether or not the party might have had any co-liability or be also authorized to close the account." He also stated that credit card companies in general would "not be real demanding" regarding proof of identity when closing an account. No one from Bank One, Citibank, First Card, or J.C. Penney testified regarding these accounts.

Finally, the affidavit of Lasovich was offered and received at the probate hearing. In his affidavit, dated April 5, 2001, Lasovich averred that he remained "convinced the women [sic] I saw in the hotel and described to the police was the same woman described in the missing person report I saw on television." Lasovich described this woman as "having a 'poofy' dark, out of date hairstyle."

The court entered its order on June 11, 2001, finding:

Wanda Krumwiede was last positively identified as being alive on June 13, 1995 at approximately 9:00 p.m. . . .

Wanda Krumwiede filed for divorce in December, 1994. Wilhelm Krumwiede did not want the divorce nor the loss of the house he purchased prior to marriage and maintained in his own name only. Evidence shows that an identifiable piece of Wanda Krumwiede's only pair of glasses was found in the wood burning stove of Wilhelm Krumwiede, on property controlled by him. Small amounts of dried blood belonging to Wanda Krumwiede were found on the back tailgate of Wilhelm Krumwiede's pickup. These findings of fact in conjunction with the extensive evidentiary record before the court is proof by a preponderance of the evidence that Wilhelm Krumwiede intentionally and feloniously killed his wife, Wanda Krumwiede.

The court then sustained Jeremy's objection, removed Wilhelm as personal representative of Wanda's estate, and appointed Jeremy as successor personal representative. Wilhelm appeals.

## ASSIGNMENTS OF ERROR

Wilhelm asserts, renumbered and rephrased, that the probate court erred in (1) determining that the directed verdict in the

1998 criminal trial did not bar application of Nebraska's homicide probate statute to Wilhelm based on either issue preclusion, the "legal effect" of the directed verdict, or the language of § 30-2354; (2) finding that Jeremy had proved by a preponderance of the evidence that Wilhelm intentionally and feloniously killed Wanda, in that such findings "are arbitrary, capricious, or unreasonable"; and (3) determining Wilhelm should be removed as personal representative and Jeremy appointed as successor personal representative.

## STANDARD OF REVIEW

In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. *In re Estate of Watkins*, 243 Neb. 583, 501 N.W.2d 292 (1993). In a bench trial of a law action, a trial court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. *Id.* In reviewing the judgment awarded by the probate court in a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Id.*

On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *In re Estate of Mecello*, 262 Neb. 493, 633 N.W.2d 892 (2001).

## ANALYSIS

Wilhelm initially suggests that the standard of review for errors appearing on the record in probate proceedings "has not been explained" and that this court should "review this case *de novo* on the facts, and make independent determinations on legal issues," similar to the standard of review employed in parental termination cases. Brief for appellant at 32-33. We disagree.

This court has previously held that in probate proceedings which do not raise "equitable matters," an appellate court reviews the decision of the county court for errors appearing on the record and does not conduct a de novo review of the facts. *In re Estate of Watkins, supra.*

In *In re Estate of Watkins*, 243 Neb. at 587, 501 N.W.2d at 295, we set forth the standard of review as follows:

In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. . . .

"In a bench trial of a law action, a trial court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence."

(Citations omitted.) Quoting *Broekemeier Ford v. Clatanoff*, 240 Neb. 265, 481 N.W.2d 416 (1992). See, also, *In re Estate of Stephenson*, 243 Neb. 890, 503 N.W.2d 540 (1993) (claim of fraud in probate proceedings, being matter of equity, reviewed de novo on appeal).

It is also the case that "[o]n a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below." *In re Estate of Mecello*, 262 Neb. at 504, 633 N.W.2d at 901. Accordingly, in the present appeal, which does not involve any equitable claims, we review the probate court's findings of fact under a "clearly erroneous" standard of review, considering the evidence in the light most favorable to Jeremy, who is entitled to every reasonable inference deducible from the evidence. See *In re Estate of Watkins, supra*. On questions of law, we reach a conclusion independent of the determination of the probate court. See *In re Estate of Mecello, supra*.

## FIRST ASSIGNMENT OF ERROR

### Collateral Estoppel

 Wilhelm contends in his first assignment of error that "Issue Preclusion Rules Apply To . . . *Neb Rev Stat* § 30-2354" and that as such, his acquittal "forecloses any proceedings against him" under § 30-2354, Nebraska's homicide probate statute. Brief for appellant at 29. Under the doctrine of collateral

estoppel, when an issue of ultimate fact has been determined by a final judgment, that issue cannot again be litigated between the same parties in a future lawsuit. *Woodward v. Andersen,* 261 Neb. 980, 627 N.W.2d 742 (2001). However, this court has also held that the doctrine of collateral estoppel is not applicable in a subsequent proceeding when the burden of persuasion is different. *State v. Young,* 249 Neb. 539, 544 N.W.2d 808 (1996); *State v. Yelli,* 247 Neb. 785, 530 N.W.2d 250 (1995). See, also, *Congleton v. Sansom,* 664 So. 2d 276 (Fla. App. 1995) (acquittal on criminal charges based on insanity does not foreclose same evidence from meeting lesser civil standard under homicide probate statute); *Matter of Estate of Congdon,* 309 N.W.2d 261 (Minn. 1981) (collateral estoppel not applicable in proceedings under homicide probate statute regarding daughter's prior acquittal of murder and conspiracy charges). The burden of persuasion in § 30-2354 is "by a preponderance of evidence." This is a different burden of persuasion than in a criminal trial. Accordingly, this argument is without merit.

### LEGAL IMPACT OF DIRECTED VERDICT IN CRIMINAL TRIAL

Wilhelm further argues in conjunction with his first assignment of error that the directed verdict in the 1998 criminal case constituted "absolute proof from a previous murder prosecution that the district court concluded no homicide had been committed," and accordingly "the very same evidence" before the probate court was not legally "sufficient to prove 'felonious' and 'intentional' killing by the greater weight of the evidence." Brief for appellant at 26-27. Wilhelm contends that the probate court must give conclusive effect to the directed verdict in Wilhelm's second criminal trial because the district court had to find a " 'complete failure' " of the evidence on an essential element of the crime charged, or that the evidence was so doubtful in character and lacking in probative value that a finding of guilt on such evidence could not be sustained. *Id.* at 27. See, *State v. Canady,* 263 Neb. 552, 641 N.W.2d 43 (2002); *State v. Johnson,* 261 Neb. 1001, 627 N.W.2d 753 (2001).

Wilhelm's contention is that because he was acquitted of killing Wanda as the result of the directed verdict in the 1998 trial, the probate court is legally precluded from reaching a different

conclusion on the same evidence in that the probate court had "no new inculpatory evidence," and "the very same evidence" submitted at the second criminal trial was before the probate court. Brief for appellant at 26-27. Wilhelm then asserts that "where a district judge dismisses a criminal prosecution upon the State's rest, the court has, by definition, found a failure of proof by the greater weight of the evidence." *Id.* at 27.

However, we cannot reach the merits of Wilhelm's argument as it relates to the directed verdict because this court cannot determine from this record whether, as Wilhelm asserts, the "inculpatory" evidence submitted at the 1998 criminal trial was "the very same evidence" before the probate court. *Id.* at 26-27. The order of the district court directing a verdict for Wilhelm states that the evidence upon which the directed verdict was granted was presented to the court between January 12 and 16, 1998. The only criminal record before this court is from the first criminal trial, which took place from August 18 through August 22, 1997, ending in a mistrial. Aside from the witnesses who testified at the probate hearing that their evidence was the same in the two previous criminal trials, the record does not show what evidence was presented at the 1998 criminal trial.

The only identifiable portion of the 1998 criminal trial contained in the record is the order of the district court directing a verdict. The record does not disclose either a list of witnesses for the State in the 1998 trial or the content of their testimony. Additionally, while there are stipulations in the record, none of these stipulations address whether the evidence at the 1997 trial was "the very same evidence" offered in the 1998 trial. While Wilhelm's counsel asserted at oral argument that exhibits 15 through 78 submitted at the probate hearing were common to both the 1997 and 1998 trials, this assertion, which cannot be determined from the record, would still not establish that these exhibits represent all of the evidence from the 1998 trial.

■ Wilhelm has failed to present either this court or the probate court below with a record demonstrating that the evidence adduced by the State in the 1998 trial was "the very same evidence" adduced by Jeremy in the 2001 probate proceeding. It is incumbent upon the party appealing to present a record which supports the errors assigned. *J.B. Contracting Servs. v. Universal*

*Surety Co.*, 261 Neb. 586, 624 N.W.2d 13 (2001); *In re Application of SID No. 384*, 259 Neb. 351, 609 N.W.2d 679 (2000). Such presentation is necessary because "[m]eaningful appellate review requires a record that elucidates the factors contributing to the lower court judge's decision." *J.B. Contracting Servs.*, 261 Neb. at 593, 624 N.W.2d at 19-20, citing *Van Ackeren v. Nebraska Bd. of Parole*, 251 Neb. 477, 558 N.W.2d 48 (1997). Accordingly, this argument is without merit.

### LEGAL INTERPRETATION OF § 30-2354

■ Finally, Wilhelm argues under his first assignment of error that the dismissal of the criminal case against him forecloses application of § 30-2354, based on the language of § 30-2354. This issue presents a question of law regarding the interpretation of a statute. In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Henery v. City of Omaha*, 263 Neb. 700, 641 N.W.2d 644 (2002).

Section 30-2354 became operative in 1977 as part of Nebraska's Uniform Probate Code and was enacted virtually verbatim from the Uniform Probate Code, § 2-803. Section 30-2354(e) states that a conviction for felonious and intentional killing, or aiding and abetting in such killing, is "conclusive for purposes of this section." The statute goes on to state that "[i]n the absence of a conviction," the statute will apply when the preponderance of the evidence shows that the decedent was killed intentionally and feloniously. Wilhelm argues that the plain language of § 30-2354 limits the applicability of the statute to two situations: (1) where there has been a conviction or (2) where "there has been no prosecution against the one who would otherwise inherit." Brief for appellant at 31. Wilhelm contends that § 30-2354 "does not address circumstances where there is a judgment of acquittal" and that the "logical interpretation of [§ 30-2354] is to conclude that acquittal judgments, like are [sic] produced in the district court in a criminal case, preclude its invocation." *Id.* We disagree.

■ The plain language of § 30-2354 requires simply the "absence of a conviction." Wilhelm would have us read into the

statute an additional requirement, the absence of a prosecution ending in acquittal. However, it is not within the province of the courts to read a meaning into a statute that is not there or to read anything direct and plain out of a statute. *Daniels v. Allstate Indemnity Co.*, 261 Neb. 671, 624 N.W.2d 636 (2001); *Nelson v. City of Omaha*, 256 Neb. 303, 589 N.W.2d 522 (1999). The statute on its face is designed to apply to killings which result in the conviction of the wrongdoer, and to killings in the "absence of a conviction."

Our reading of the plain meaning of § 30-2354 is supported by the comment to § 2-803 of the Uniform Probate Code, which states in relevant part:

> While conviction in the criminal prosecution under this section is treated as conclusive on the matter of succession to the murdered person's property, acquittal does not have the same consequences. This is because different consider-ations as well as a different burden of proof enter into the finding of guilty in the criminal prosecution. Hence it is possible that the defendant on a murder charge may be found not guilty and acquitted, but if the same person claims as an heir or devisee of the decedent, he may in the probate court be found to have feloniously and intention-ally killed the decedent and thus be barred under this sec-tion from sharing in the estate. An analogy exists in the tax field, where a taxpayer may be acquitted of tax fraud in a criminal prosecution but found to have committed fraud in a civil proceeding.

Unif. Probate Code § 2-803, comment, 8 U.L.A. 460 (1998). Compare *United States v. Real Estate Boards*, 339 U.S. 485, 70 S. Ct. 711, 94 L. Ed. 1007 (1950) (relying on federal tax cases to hold that directed verdict in criminal price-fixing trial did not bar civil suit, where civil suit was based solely on record made in criminal trial).

■ The plain unambiguous language of § 30-2354 does not support Wilhelm's argument. We determine that Wilhelm's acquittal of criminal liability for the murder of Wanda is the "absence of a conviction" for purposes of § 30-2354 and that the probate court was not bound by the directed verdict granted in Wilhelm's 1998 criminal trial.

## SECOND ASSIGNMENT OF ERROR

In his second assignment of error, Wilhelm argues that the probate court erred in finding that Jeremy had proved by a preponderance of the evidence that Wilhelm killed Wanda. Wilhelm also contends that the findings of the county court were arbitrary, capricious, or unreasonable.

In reaching its conclusion that Wilhelm had intentionally and feloniously killed Wanda, the court found, inter alia, that (1) Wilhelm did not want the divorce; (2) Wilhelm did not want to lose the house he purchased prior to the marriage; (3) a portion of Wanda's only pair of eyeglasses was found in Wilhelm's shop stove after Wanda's disappearance, on property controlled by him; and (4) small amounts of dried blood belonging to Wanda were found on Wilhelm's truck.

These findings by the probate court were not clearly erroneous. The testimony of Peterson and others showed that Wilhelm did not want the divorce and did not want Wanda to receive the family home in the divorce proceedings. Testimony and physical evidence also supported the probate court's finding that a portion of Wanda's only pair of eyeglasses was found in Wilhelm's shop stove shortly after her disappearance. Forensic evidence further supported the probate court's finding that traces of Wanda's blood were found on Wilhelm's pickup after Wanda's disappearance.

Wilhelm argues that there is "no proof that Wanda was killed, and certainly not that she was killed by [Wilhelm]." Brief for appellant at 22. The record shows otherwise. The eyeglasses and bloodstains, as noted by the probate court, are evidence that Wanda was murdered, and this evidence was directly linked to Wilhelm through his pickup and shop stove.

Additionally, the fact that Wanda abruptly and without explanation disappeared sometime after 9 p.m. on June 13, 1995, and has not been seen by any of her family, friends, or acquaintances since that time is further evidence supporting the county court's finding. This evidence is particularly significant given the unrefuted testimony regarding Wanda's love for her children and grandchildren and her ongoing involvement in their lives.

Wilhelm asserts that evidence adduced in the probate hearing shows that Wanda was alive after June 13, 1995. This evidence

includes Lasovich's affidavit in which he states that he "remain[s] convinced" that he saw Wanda on June 20, 1995, and describes the woman he saw as "having a 'poofy' dark, out of date hairstyle." However, Vetick testified that on June 6, she changed Wanda's hairstyle to "really short and real wispy . . . that real modern, wispy look."

Wilhelm also points to the testimony of Slotsky that Wanda's Citibank and First Card credit accounts were closed "by the consumer" in 1996, after Wanda disappeared. However, Slotsky testified that he could not determine, based on the information provided by Trans Union, whether Wanda or someone else closed the accounts. There is also no evidence in the record from a representative of First Card or Citibank regarding their specific procedures for closing inactive accounts. In particular, regarding the First Card account, Slotsky testified:

Q Over to the right [of the credit report] it says, "Account closed by consumer"?

A Correct.

Q Does that mean that someone would have to actually contact them to close that account?

A That would indicate that the cardholder or the account holder actually contacted the creditor and affirmatively said to close this account.

Q Are you familiar with that process for that specific cardholder — or for that card company?

A Only, generically, not specifically, no.

Q So, you wouldn't know what process they use to verify whether an individual was who they represented themselves to be?

A Oh, no. I would expect just general industry knowledge that they would not be real demanding about identification. If someone says, "I'm the consumer," maybe had the account number — it's not something that's going to be terribly damaging to anyone. If I call up and cancel your credit cards and you try to use it, you get mad and call the credit company and work it out. You haven't been harmed. So, yeah, I would — It would surprise me to learn that a credit grantor would go to extensive identity verification procedures for that.

While Wilhelm would have us conclude that Wanda herself closed these two accounts in 1996, the record, construed in the light most favorable to Jeremy, does not support such a finding.

Wilhelm further contends that there was beer in Wanda's refrigerator after she disappeared, indicating she may have "relapsed into alcoholism." Brief for appellant at 26. However, those witnesses who testified regarding Wanda's alcoholism, including Wilhelm, stated that they had never seen Wanda take a drink after she was diagnosed in 1986.

Wilhelm also relies on the receipt for the rental of a post office box in Wanda's name, taken out in 1996 in Lyons. However, there is no supporting evidence indicating who actually rented the post office box or the procedures required to rent the box. Although the name "Wanda Krumwiede" is handwritten in printed letters on the receipt as the *"Name of Customer"* renting the box, there was no other evidence offered to establish who filled out the receipt, whether the handwriting on the receipt was Wanda's, or whether Wanda normally signed her name as it appeared on the receipt. The only evidence regarding the receipt was provided by Huffman, who testified in the 1997 criminal trial:

Q Could I show you Exhibit No. 112, please? . . .

. . . .

Q . . . [D]o you recognize that as a document of the kind that you'd use at the postal — at the post office?

A Yes.

Q And what is that particular kind of form used for?

A It's for a post office — when we pay our post office box fees.

Q It's a box —

A It's a receipt.

Q A receipt for the box fee payment?

A (Witness nodded affirmatively.)

As with the credit report, Wilhelm would have us conclude that the post office box receipt shows that Wanda was alive in 1996. However, given the state of the record as to the manner in which the receipt was obtained, this piece of evidence, considered in the light most favorable to Jeremy, does not support Wilhelm's contention.

Finally, Wilhelm argues that the record supports several alternative theories to explain Wanda's disappearance, including the possibility that Wanda relapsed into alcoholism and suddenly left, that Wanda was abducted by the two unknown men seen in her driveway on June 13, 1995, or that Wanda was killed by someone other than Wilhelm. However, these theories do not explain why Wanda's only pair of eyeglasses, which she was wearing on the day she disappeared and which were still under warranty at the time, were found burned in Wilhelm's shop stove, along with a 1969 wedding announcement. These theories also do not explain Wanda's bloodstains on the interior of Wilhelm's pickup.

The issue before us on appeal is not whether there was evidence to support Wilhelm's claim of innocence, but whether the record shows that the probate court's findings are clearly erroneous. See *In re Estate of Watkins*, 243 Neb. 583, 501 N.W.2d 292 (1993). Based upon our review of the record, we cannot conclude that the probate court was clearly erroneous in finding that Jeremy met his burden in showing by a preponderance of the evidence that Wilhelm intentionally and feloniously killed Wanda. As such, the court also did not err in removing Wilhelm as personal representative and appointing Jeremy as successor personal representative.

### CONCLUSION
The decision of the probate court is affirmed.

AFFIRMED.