IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE ESTATE OF HOWARD

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ESTATE OF ROBERT EUGENE HOWARD, DECEASED.

JUDY FORRESTOR, PERSONAL REPRESENTATIVE, APPELLEE,

V.

JOHN HOWARD, APPELLANT.

Filed October 3, 2017.    No. A-15-648.

Appeal from the County Court for Douglas County: MARCENA M. HENDRIX, Judge. Affirmed.

Martin A. Cannon, of Cannon Law Office, for appellant.

Richard W. Whitworth, of Reagan, Melton & Delaney, L.L.P., for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

### INTRODUCTION

Following the death of Robert Eugene Howard (Robert), his nephew, John Howard (John), objected to the personal representative's inclusion of $25,228.03 derived from two of Robert's bank accounts into the estate inventory. John claimed Robert gifted to him all the funds within these accounts prior to his death. John appeals from the decision of the county court for Douglas County which concluded Robert did not gift the funds to John, John had no entitlement to the accounts, and the bank accounts were estate assets. The court further ordered that John was excluded from the distribution of the remaining assets of Robert's estate. We affirm.

- 1 -

BACKGROUND

Robert died intestate on May 21, 2011. He was unmarried, without issue, and was preceded in death by six siblings. He was survived by two sisters, Judy Forrestor (Judy) and Annabelle Powell (Annabelle), and a number of nieces and nephews and their children. Annabelle subsequently died, leaving Judy as the only surviving sibling. Judy became personal representative of Robert's estate in September 2011. Judy filed a "Formal Petition for Complete Settlement after Formal Intestate Proceeding" on August 20, 2014. The final accounting later received by the county court shows the assets in the estate totaled $28,408.03, of which $25,228.03 was "Cash from Bank Account." After deductions for obligations of the estate, the remaining balance for proposed distribution was $25,045.99. Not counting a proposed attorney fee, the "Revised Proposed Schedule of Distribution" reflects 22 other distributees standing to inherit between 1/7 and 1/84 of the estate. The distributee list includes John, but states for his share, "No distribution - took cash withdrawals from bank [account] prior to proceedings[.]" It also includes John's sister, Peggy Smith (Peggy), and states for her share, "No distribution - took control of personal property in residence and sold[.]"

On February 26, 2015, a hearing took place on the petition and John's objection to closing the estate (the objection is not in our record). Judy, John, and Peggy were the only witnesses. A summary of their testimony follows.

Peggy said Robert was her favorite uncle. "[H]e was around more probably than anybody else" and "he was just a nice guy. He had a nice temperament. And he'd come over for dinner all the time." Robert would come over to her father's frequently, or sometimes he would call and ask Peggy and her husband, Murray Smith (Murray), to dinner. After her father passed away, Peggy described seeing Robert once or twice a month. She also mentioned that Robert "especially liked" John.

John testified that, growing up, he remembered Robert visiting and helping with projects like pouring sidewalks or fixing the roof. John said, as an adult, "I suppose, really, after my father passed away, I really had no true family role model so [Robert] was it." John acknowledged he had a felony conviction on a drug charge in 2001 for which he did jail time. When asked if he had other convictions, John responded, "Oh, probably many," and he noted two felonies, which included another drug-related charge. John believed his involvement with Robert helped him behave himself.

For the two years prior to Robert's death, John said he visited Robert at home and the two often went out to eat at a café or another restaurant. Robert and John met for breakfast at the café every Sunday, and they would only contact each other during the week if one of them had to cancel the breakfast.

One Sunday in May 2011, Robert was not at the café and he had not canceled. John asked café employees if Robert had arrived and left before John's arrival. Upon learning Robert had not been to the café, John called Robert's house, but no one answered the phone. John then drove to Robert's home and knocked on the door. John noticed three days of newspapers remained on the porch and said "that's when I started getting a bad feeling."

John left and continued with plans to celebrate Mother's Day with his sister, "Jeanne." Later in the day, John discussed his concerns about Robert with Jeanne. After speaking with Jeanne, John went to O'Rourke Apartments, where Robert worked as a maintenance engineer, and confirmed Robert had been to his last scheduled shift on the preceding Friday. Jeanne called Peggy, who in turn called area hospitals and learned Robert had been admitted to the Nebraska Medical Center. Peggy recalled this being "[a]t least a week" before Robert's death.

Peggy stated when she saw Robert at the hospital that Sunday or possibly the very next day, Robert was capable of expressing himself and understanding what was going on. Peggy claimed Robert "wanted me and, I believe, my sister and brother to make decisions." Peggy claimed to have gone to the hospital every day and visit for hours between Mother's Day and Robert's death on May 21, 2011. Peggy said she did not talk to Robert about finances prior to his hospitalization, but in the past she and "all the members of my family" talked to Robert about having a will because "somebody should get his estate instead of the actual State, as my dad would say." When asked if Robert revealed to her what he wanted to have happen to his property in the event of his death, Peggy stated that "[h]e revealed it on a piece of paper, and he told my husband by giving him the deed to his house." Peggy testified Exhibit 7 was a "piece of paper that the nurse had given us to put there in case people wanted to write things if [Robert] was gone or in - asleep, so they could say that they stopped by or whatever." Apparently, "[s]ometime down the road," Robert had a tube in his throat making it difficult to speak. Peggy did not recall whether Judy was contacted only after Robert was intubated; she did recall it was several days after Robert was in the hospital before Judy was called.

John said he went to visit Robert every day after learning about his hospitalization, spending at least 2-1/2 hours there each day. Several days after Robert was admitted, John's brother-in-law, Murray, called and told John that Robert wanted to see him. John went to the hospital after the phone call. During this visit, John stated Robert gave him two plastic debit cards and two paper bank cards displaying account numbers. These cards provided access to Robert's money market and checking accounts at Bank of the West. John also claimed Robert provided the PIN numbers for each card.

With the cards and the PIN numbers, John could withdraw funds from Robert's respective bank accounts using an "ATM machine." Robert died on May 21, 2011. Between May 23 and June 6, John withdrew $4,803.00 from Robert's checking account in 16 separate withdrawals. Each withdrawal during this period was approximately $300, the maximum withdrawal allowed "at any given time." John withdrew $900 on May 23; $300 on May 24; $300 on May 25; $300 on May 26; $303 on May 27; $1,200 on May 31; $300 on June 1; $300 on June 2; $300 on June 3; and $600 on June 6.

John said he made the first $300 withdrawal with Jeanne and gave the money to Judy for funeral expenses. John testified he believed he was entitled to withdraw money from the accounts, but did not provide an explanation for the remaining withdrawals. From the time of Robert's death (May 2011) until Judy was appointed as personal representative (September 2011), John maintained control of the bank cards. Eventually, John gave the cards to other people, one to Judy and the other to his sister, Jeanne. John did not believe giving the cards to his family members relinquished his right to the money in the accounts, but Judy and Jeanne never returned the cards.

Judy included the value of the bank accounts associated with the two cards in the value of the estate.

Judy testified that, as personal representative, she closed Robert's personal accounts at Bank of the West and transferred the funds into an estate account. Judy said when she closed Robert's accounts at Bank of the West, the only name on Robert's personal accounts was his own; there was no other beneficiary listed. She also collected and sold Robert's personal property, and filed a final accounting and a proposed distribution with the court.

On March 4, 2015, the county court entered a "Formal Order for Complete Settlement after Formal Intestate Proceeding." In relevant part, the court approved the final accounting and schedule of distribution, and overruled John's objection to including the bank account funds in the estate. The court found the bank accounts were estate assets, Robert did not gift the funds to John, John had no right to any portion of the funds, and John should be excluded from the distribution of the estate. John filed a motion (March 2) and amended motion (March 9) for new trial; the county court's order denying the same was filed on May 6. John timely appealed.

## ASSIGNMENTS OF ERROR

John assigns, reordered and restated, that the county court erred by (1) determining Robert did not gift the cash from his bank accounts to John, and (2) excluding certain testimony and a handwritten note from evidence.

## STANDARD OF REVIEW

In the absence of an equity question, an appellate court, reviewing probate matters, examines for error appearing on the record made in the county court. *In re Estate of Krumwiede*, 264 Neb. 378, 647 N.W.2d 625 (2002). When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Estate of Muncillo*, 280 Neb. 669, 789 N.W.2d 37 (2010).

When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, we review the admissibility of evidence for an abuse of discretion. *Japp v. Papio-Missouri River NRD*, 273 Neb. 779, 733 N.W.2d 551 (2007). In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Moreno v. City of Gering*, 293 Neb. 320, 878 N.W.2d 529 (2016).

## ANALYSIS

*Gift of Cash in Bank Accounts.*

John claims Robert gifted his bank accounts to him as evidenced by Robert giving him the debit cards and their PIN numbers. John argues that Robert's actions met the requirements for a valid gift: "[Robert] physically delivered the plastic debit cards. He physically or verbally furnished the personal identification numbers. At that point, he had given John unfettered access to funds, not dependent upon any further human action or approval." Brief for appellant at 20 (emphasis in original). John also suggests that there was "nothing more that [Robert] could have

done to effect such a gift from his bed." *Id*. (emphasis in original). Further, John asserts that "the donor [Robert] retained nothing." *Id*. at 21 (emphasis in original).

To make a valid and effective gift inter vivos, there must be an intention to transfer title to the property, and a delivery by the donor and acceptance by the donee. *Ferer v. Aaron Ferer & Sons Co.*, 273 Neb. 701, 732 N.W.2d 667 (2007). The person asserting the gift must prove all the essential elements by clear, direct, positive, express, and unambiguous evidence. *Id.* Dominion over and title to the gift must pass to the donee by the voluntary, intentional act of the donor. *Johnson v. Omaha Loan & Bldg. Ass'n*, 128 Neb. 37, 257 N.W. 370 (1934). It must be such a delivery as will wholly pass title to the property which is the subject-matter of the gift and place it entirely beyond the control and dominion of the donor. *Id.*

Judy argues the ATM cards only represented a means of access to the funds within the accounts, not title to or ownership of the funds within the accounts. She asserts that because Robert maintained title and dominion over the bank accounts after John gained access through the debit cards, Robert did not gift the accounts to John. Judy claims, "At best, [John] had a limited agency during his uncle's life, which terminated at his uncle's death." Brief for appellee at 13. We agree.

Any statements made by Robert allegedly giving John the money in his bank accounts are irrelevant insofar as such statements would not affect Robert's ownership of his accounts or his ability to access or restrict access to the funds in those accounts. To the extent Robert's alleged action of giving John the debit cards and PIN numbers to his bank accounts could be construed to give John some kind of temporary agency authority over the accounts, the death of the sole party or last surviving party of a bank account terminates the authority of an agent. See *Krzycki v. Krzycki*, 284 Neb. 729, 824 N.W.2d 659 (2012). See, also, Neb. Rev. Stat. § 30-2720(c) (Reissue 2016).

There was no evidence presented that Robert's accounts were anything other than single-party accounts, nor was there any evidence that John, or anyone else, was named as a beneficiary payable upon death or otherwise. All such personal bank accounts are subject to statutes governing nonprobate transfers of accounts, and only if a contract of deposit does not conform to the statutory forms provided in Neb. Rev. Stat. § 30-2719(a) (Reissue 2016), can evidence be presented on the issue of the intent of the depositor. See *Krzycki, supra*. An account "means a contract of deposit between a depositor and a financial institution, and includes a checking account, savings account, certificate of deposit, and share account." Neb. Rev. Stat. § 30-2716(1) (Reissue 2016). An "[a]gent means a person authorized to make account transactions for a party." § 30-2716(2). The amount on deposit in a single-party account without a payable on death designation is transferred as part of the decedent's estate. See Neb. Rev. Stat. § 30-2723(c) (Reissue 2016). The type of account held by the decedent may be altered by written notice by a party to the financial institution, and the "notice must be signed by a party and received by the financial institution during the party's lifetime." Neb. Rev. Stat. § 30-2724(a) (Reissue 2016).

There was no evidence received to indicate Robert's bank accounts were anything other than single-party accounts as set forth in § 30-2719(a). Therefore, any alteration to such an account, including making a payable upon death designation, must be made by written notice to the financial institution during the party's lifetime. See § 30-2724(a). That was not done here.

Accordingly, John's mere possession of Robert's debit cards and PIN numbers does not qualify as a valid and effective inter vivos gift, as such possession did not constitute a delivery that wholly passed title to the bank accounts, nor placed those accounts entirely beyond the control and dominion of Robert. See *Johnson, supra*. John's lack of control over those bank accounts following Robert's death was evidenced by his own testimony that he eventually turned the debit cards over to Judy and Jeanne. Since the accounts remained solely titled in Robert's name, the accounts were transferred to Robert's estate upon his death as required by law. See § 30-2723(c). John failed to prove all the essential elements of an inter vivos gift by clear, direct, positive, express, and unambiguous evidence. See *Ferer, supra*.

*Excluded Evidence*.

John claims the trial court improperly excluded certain testimony and exhibit 7. He argues he and Peggy should have been allowed to testify that Robert told them he wanted John to have all the money in his bank accounts, and Exhibit 7 should have been admitted as further evidence of this.

As to the excluded testimony, John's trial counsel made an offer of proof that Peggy "would testify that the decedent explained to her that he would like her husband to receive his home and that he would like her brother, the plaintiff here, John, and herself to receive the money in his bank accounts." Another offer of proof was made that John would testify Robert told him he "wanted John and his sister, Peggy, to have the money in those accounts." Finally, an offer of proof was made that if John was "allowed to testify, he would testify his uncle gave him the PIN numbers because he wanted him to have all the money in the accounts." Hearsay objections were sustained as to this evidence.

Exhibit 7 is a lined piece of paper that displays the Nebraska Medical Center logo and is marked "Progress Notes" at the bottom. It displays at least four different types of handwriting using highlighter, pencil, and pen. The exhibit bears no signs it belonged to Robert or was in his exclusive possession. Robert did not sign his name anywhere on the document. The document displays two sentences of pencil handwriting which John asserts were written by Robert: "quick deed on house 1301 So. Ave [sic] 51 ave" and "call John I want him to get money out of of [sic] back [sic] him & peg." Judy objected to the admission of exhibit 7 based on hearsay, foundation, and authentication.

John argues the excluded testimony and exhibit should have been admitted over hearsay objections because they fall under hearsay exceptions for state of mind and admissions against pecuniary interest. However, we need not address John's evidentiary arguments, because even if the challenged evidence had been admitted, the outcome of the case would have been the same.

The admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Moreno v. City of Gering*, 293 Neb. 320, 878 N.W.2d 529 (2016). The exclusion of the noted evidence in this case cannot be said to have prejudiced any substantial right belonging to John because any evidence of Robert's intent to gift his bank accounts is irrelevant in light of statutory restrictions on how such accounts must be transferred upon the account owner's death. As previously discussed, Robert's personal bank accounts were subject to statutes governing nonprobate transfers of such accounts. Therefore, regardless of

Robert's intent to gift the money in his bank accounts (as allegedly expressed verbally by Robert or through exhibit 7), when John took possession of the debit cards, any temporary agency authority over the accounts John may have had to access Robert's bank accounts while Robert was alive would have terminated upon Robert's death. As set forth above, the death of the sole party or last surviving party of a bank account terminates the authority of an agent. See *Krzycki, supra*. See, also, § 30-2720(c). The balances remaining in Robert's accounts were transferred as part of the decedent's estate by operation of law. See Neb. Rev. Stat. § 30-2723(c). Robert's intent with regard to his bank accounts is irrelevant since the law specifically states how any balance remaining in such accounts upon death must be transferred. The only time evidence of intent with regard to such bank accounts is relevant and can be presented is if a bank account does not conform to the statutory forms provided in § 30-2719(a). There is no evidence of lack of conformity to the statute in the present matter. Section 30-2719(a) provides for single-party and multiple-party accounts, and also provides that ownership of a single-party account passes as part of a party's estate upon death of the party. Accordingly, assuming without deciding the challenged evidence should have been admitted, any error in the county court's exclusion of this evidence is not reversible error. The exclusion did not unfairly prejudice a substantial right of the complaining party (John) in that admission of the evidence would not have changed the outcome.

## CONCLUSION

For the reasons set forth above, the decision of the county court is affirmed.

AFFIRMED.