IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE ESTATE OF BOWLEY

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE ESTATE OF GERTRUDE C. BOWLEY, DECEASED.

DE. STEVEN J. BOWLEY ET AL., APPELLANTS,
V.
ALLEN FUGATE, PERSONAL REPRESENTATIVE OF THE ESTATE OF GERTRUDE C.
BOWLEY, DECEASED, AND GARY BOWLEY, APPELLEES.

Filed January 28, 2014.   No. A-13-048.

Appeal from the County Court for Lincoln County: MICHAEL E. PICCOLO, Judge. Affirmed.

Monelle M. Beal, Patrick M. Heng, and Terrance O. Waite, of Waite, McWha & Heng, for appellants.

Katherine R. Hall, P.C., L.L.O., for appellee Allen Fugate.

Kent E. Florom, of Lindemeier, Gillett & Dawson, for appellee Gary Bowley.

INBODY, Chief Judge, and RIEDMANN, Judge.

INBODY, Chief Judge.

## I. INTRODUCTION

Dr. Steven J. Bowley, Larry R. Bowley, and Loretta K. Poore, the appellants, have appealed the decision of the Lincoln County Court denying their request to remove Allen Fugate as personal representative of the estate of their mother, Gertrude C. Bowley, and denying their motion to appoint a special administrator. As required by Neb. Rev. Stat. § 30-1601(3) (Cum. Supp. 2012), a supersedeas bond hearing was held, and the county court set the bond at $15,000, which decision the appellants have also assigned as error. Gary Bowley contends that the county court erred in admitting certain exhibits into evidence over objection. For the reasons set forth herein, we affirm the decision of the county court.

## II. STATEMENT OF FACTS

Gertrude was 89 years old when she died on January 19, 2010. She left behind four adult children: Steven, a doctor who lives in Phoenix, Arizona; Larry, who is retired and travels the country in his recreational vehicle; Loretta, who lives in Omaha, Nebraska; and Gary, who lived at home with Gertrude and had worked on the family farm since December 1977. Gary was Gertrude's primary caregiver during the years she was confined to a wheelchair, from 2005 until her death in 2010. Later in her life, Steven, Larry, and Loretta rarely called or visited Gertrude; only Gary remained close with Gertrude in her later years.

After Gertrude fell and broke her hip in January 2005, she became upset when her children, other than Gary, did not visit her. At that time, Gertrude decided to remove Steven and Larry as payable on death (POD) beneficiaries on certificates of deposit (CD's) and replaced Gary as the POD beneficiary on both CD's.

In 2008, Gertrude hired Fugate, a practicing Nebraska lawyer since September 1982, to prepare a durable general power of attorney on her behalf naming Gary as her attorney in fact. Gertrude was familiar with Fugate, because he had acted as Gertrude's attorney previously, having prepared Gertrude's will which had been executed in April 1998. Gertrude's will designated Fugate as the personal representative for her estate. Gertrude signed the power of attorney on December 16, 2008. Shortly thereafter, Gertrude's power of attorney was used to sell her lake house property for nearly $400,000. Gertrude placed these proceeds in a First National Bank investment agency account that she opened, making herself and Gary the owners of the account.

After Gertrude's death on January 19, 2010, Steven learned that Gary had been named as Gertrude's power of attorney. At that time, Steven informed Fugate that he had concerns about Gary's and Gertrude's mental abilities and that based upon those concerns, he felt it was inappropriate for Gary to have the power of attorney over Gertrude's estate. Steven also expressed concerns to Fugate that Gary had used the power of attorney to transfer assets to himself, and Steven requested that Fugate, as personal representative, investigate and take action to recover assets that Steven felt belonged to Gertrude's estate.

However, after Fugate refused Steven's request to act to recover assets that Steven felt belonged to Gertrude's estate, the appellants filed an action on April 19, 2012, to remove Fugate as the personal representative and sought the appointment of a special administrator. A hearing thereon was held on August 13 and October 10. The evidence adduced at trial can be divided into several categories: evidence regarding Gertrude's power of attorney; evidence regarding the CD's, including changes made to the beneficiaries and subsequent changes to the asset form; the sale of the lake house property and the proceeds therefrom; Gertrude's mental status; concerns regarding Gary; and concerns about Fugate as personal representative.

### 1. GERTRUDE'S POWER OF ATTORNEY

There was substantial testimony regarding the circumstances surrounding Gertrude's signing of her durable power of attorney on December 16, 2008. The December day that Gertrude signed the durable power of attorney was a very cold day. Gary drove Gertrude, who was confined to a wheelchair, to Fugate's law office. While Gary entered Fugate's office to inform him that they had arrived, Gertrude remained in the van. Due to the weather conditions,

Fugate took the power of attorney documents to the van where Gertrude was waiting and met with her privately.

Fugate testified that he had several conversations with Gertrude regarding the durable power of attorney and that Gertrude stated she wanted a durable power of attorney so Gary could pay her bills, handle her financial affairs, and handle a real estate transaction that she was working on. During Fugate's discussion with Gertrude, she recognized who he was; she was oriented as to time, person, and place; and Fugate explained to Gertrude what health care power of attorney and financial power of attorney documents were, what purpose they served, and what the consequences of signing those documents were. Gertrude asked questions regarding the financial power of attorney, including whether she could still handle her own financial affairs if she was of a mind or desire to do so. Fugate informed her that the document did not take away her power to do so, but, rather, the documents simply provided that Gary could do it. Gertrude indicated that she understood, and Fugate believed that she fully understood the purpose and effect of the power of attorney, knew the nature of her estate at that time, and was satisfied with the documents. Gertrude executed both the health care power of attorney and financial power of attorney on that date with the notary and witnesses coming to the van to be present during the signing of the documents. Fugate further testified that Gary did not have any participation in procuring the power of attorney.

## 2. CD'S OWNED BY GERTRUDE

There was substantial testimony regarding the CD's owned by Gertrude, the change made to the POD beneficiaries of those CD's, and the changes made to the asset form of the CD's.

In 2001, Gertrude was the owner of three CD's, with each of her sons named as a POD beneficiary on one of the CD's. In February 2005, Gertrude changed the beneficiaries on two of those CD's, removing Steven and Larry as POD beneficiaries and replacing them with Gary as POD beneficiary. Thus, after February 2005, Gertrude was the owner of the three CD's with Gary as POD beneficiary on all three CD's.

These three CD's totaling $275,013.35 were liquidated into a money market account in October 2008, with Gertrude again listed as the account owner and Gary as POD beneficiary. This change in asset form was made using Gertrude's signature; the power of attorney was not used. A few months later, on December 18, $250,000 was withdrawn from the money market account in order to open an account with an investment service, which was then used to purchase a Symetra Custom 7 annuity. Gertrude remained the owner of the annuity, and Gary remained named as POD beneficiary. The annuity was opened using Gertrude's power of attorney.

Steven testified that he was not claiming that Gary used Gertrude's power of attorney to change the beneficiaries of the CD's in 2005; however, he was contending that Gary used the power of attorney to assign the proceeds to himself when the funds were invested into the annuity, that Gary used undue influence over Gertrude, or that Gertrude lacked the capacity to execute documents naming Gary as co-owner of the account. He also claimed that Fugate failed to investigate what Steven felt was Gary's inappropriate use of the power of attorney and that Fugate did not ask him any questions about the transfer of the CD's.

Fugate testified that Gertrude had expressed in conversations with him in early February 2005 that she was unhappy with her children, other than Gary, because they had not visited her

after she broke her hip in January 2005, even after she requested that they do so, which prompted her to remove Steven and Larry as POD beneficiaries of CD's that Gertrude owned. At that time, Fugate advised Gertrude that since there was a specific provision in her will concerning the CD's, that they prepare a codicil to remove that provision; however, Gertrude indicated that she was going to take care of the matter herself at the bank. Fugate testified that he did not make inquiries from Steven, Larry, or Loretta regarding the 2005 change of POD beneficiaries on the CD's because of his telephone conversation with Gertrude wherein she was "pretty clear as to what she was going to do and why she was going to do it."

As personal representative of Gertrude's estate, Fugate investigated the change of asset form of the CD's and determined that although Gertrude had moved the money from the CD's to a money market account, the ownership and beneficiary of the investment remained the same. Further, although the nature of the asset changed from a CD to a money market account in 2008, Fugate saw no reason to question Gary regarding Gertrude's state of mind at the time the transaction occurred because the ownership of the asset and the beneficiary of the asset remained unchanged since February 2005. Additionally, Fugate noted that he had met with Gertrude in person when the power of attorney was executed in 2008, so he was aware of her condition at that time. Further, although the nature of the asset changed again when the money was moved from the money market account to the Symetra annuity in December 2008, the ownership of the asset and the beneficiary of the asset again remained the same with Gertrude being the owner of the asset and Gary the POD beneficiary.

### 3. SALE OF LAKE HOUSE PROPERTY AND PROCEEDS

The sale of the lake house property and the proceeds therefrom were also the subject of substantial testimony.

In December 2008, Gertrude sold her lake house property for $400,000 with a term interest provision which essentially provided that Gertrude and Gary were entitled to live in the lake house for their joint and survivor lifetime use, not to exceed 12 years. Gary signed the purchase agreement and deed of conveyance for Gertrude using the power of attorney. The sale of the lake house property closed on January 15, 2009, and a check was made payable to Gertrude for the sale proceeds in an amount of approximately $395,000. That same day, Gertrude opened a First National Bank investment agency account with herself and Gary listed as account owners and deposited the entire amount of the proceeds from the sale of the lake house property into that account. Gertrude's power of attorney was not used to open the First National Bank investment agency account; however, Gertrude did not visit First National Bank in person to open the account. Rather, First National Bank employees prepared the documents required to open the investment agency account and gave them to Gary, who took them to Gertrude to sign, and then brought them back to the bank. Fugate testified that under the circumstances, he did not find this unusual or out of the ordinary, because at that time of the year, it was a cold winter and Gertrude was confined to a wheelchair, so Gary did Gertrude's business for her.

Steven testified as to his concerns with the sale of the lake house property. Steven testified that it was his understanding that Fugate was involved in facilitating the sale of the lake house property by giving Gary power of attorney to sell the property and that Fugate was also

- 4 -

involved with the title company. Steven testified that it was his impression the lake house property was sold after Gary was given power of attorney and that half of the proceeds were put in Gary's name with the other half of the proceeds put in common ownership among the other siblings. Further, Steven testified that Fugate did not specifically respond to his concern over Gary's co-ownership of the account in which the lake house property proceeds were deposited.

Contrary to Steven's testimony, Fugate testified that he was not involved in the negotiation or sale of the lake house property; another attorney, George Clough, had negotiated the agreement for Gertrude. The deed of conveyance of Gertrude's lake house property was prepared by an abstract title company, in which Fugate has an interest in. He did review the deed of conveyance, and at the time the issuance of title insurance commitment came through his office, he reviewed the purchase agreement and spoke with Clough about some language regarding a term interest provision included in the purchase agreement that needed to be included in the deed. Additionally, after being appointed personal representative, Fugate personally met with Clough and discussed the sale of the lake house transaction with him.

Fugate testified that the purchase agreement for the lake house property which he viewed matched the description of the real estate transaction that Gertrude had described to him during their conversations in the van while Gertrude was executing her power of attorney several weeks earlier. Additionally, Fugate testified that Gertrude likely received a premium price for the lake house property and that the terms of the sale included the reservation clause which fulfilled Gertrude's desire to remain in her own home until her death.

Fugate testified that he did not discuss the opening of the First National Bank investment agency account with Gary, because he was interested in independent evidence of how the account was set up which was best provided by bank personnel. However, Fugate admitted that because bank personnel sent the documentation for opening the investment agency account home with Gary for Gertrude to sign, bank personnel were not present when Gertrude signed the documents, and the only person who would have known Gertrude's state of mind when she executed those documents was Gary.

Fugate determined that Gertrude's power of attorney had not been used to open the investment agency account; the account was set up with Gertrude's signature, which Fugate recognized as Gertrude's handwriting. Fugate testified that the disposition with the investment agency account was consistent with Gertrude's earlier expressions of displeasure with her children, other than Gary, which had prompted her to remove Steven and Larry as POD beneficiaries of the CD's in 2005. Additionally, First National Bank trust department personnel were satisfied that there was nothing unusual or suspicious in the opening or use of Gertrude's investment agency account.

Fugate's inquiry with First National Bank indicated that the bank took the position that the investment agency account was held in tenancy-in-common, which meant that upon Gertrude's death, one-half of the account belonged to the estate and one-half belonged to Gary. Consequently, Fugate inventoried half of the proceeds of the investment agency account in Gertrude's name as a probate asset and half in Gary's name as a tenant-in-common asset. The one-half of the investment agency account that was inventoried as an estate asset was not specifically disposed of under the will except through the residuary clause which gave the residue of Gertrude's estate to her four children in equal shares. Further, Fugate monitored the

investment agency account and took steps to freeze not only the probate assets in that account, but also the nonprobate assets, pending a final order of complete settlement approving the schedule of distribution.

### 4. EVIDENCE REGARDING GERTRUDE'S MENTAL STATUS

There was contradictory evidence presented regarding Gertrude's mental status. Steven and Larry both testified that Gertrude was confused. According to Steven, his last face-to-face visit with Gertrude occurred in 2000. He was visiting Nebraska and called Gertrude the day before he planned to visit her and told her that he was going to come and spend the night; however, when he arrived at Gertrude's home the following day, she did not recognize him. Steven testified that he did not see his mother face-to-face after 2000, because he determined, based on his telephone calls with her, that doing so was futile; according to Steven, as early as 2001, Gertrude was unable to converse with him coherently and "she was so confused that she didn't know what was going on." During their telephone conversations, Gertrude was often confused, did not know what was going on, did not have the ability to carry on a conversation, displayed an inability to remember previous conversations, asked the same questions repeatedly, and did not know the answers to simple questions. Despite this, Steven described his relationship with Gertrude as a "typical mother-son relationship" in which he has called her "frequently," which he defined as once or twice per month. However, he admitted that, since 2005, he did not have much contact with Gertrude and that he "pretty much stopped calling" Gertrude in 2004 or 2005.

Larry also testified regarding instances of Gertrude's confusion. He described a situation in March 2005, where he had talked to Gertrude on the telephone to tell her that he would be visiting her the following day and would be staying overnight; however, the following day, when Larry arrived at Gertrude's home, she did not remember that he was coming to visit. According to Larry, in 2001 or 2002, Gertrude accused him of taking money out of her bank account; however, Larry testified that he never had access to Gertrude's bank account, so it was Larry's opinion that Gertrude must have given money to Gary to make some payments and then had forgotten that she did so. The evidence actually established that Larry was listed as a co-owner of a joint account at First National Bank with Gertrude and Gary as the other co-owners.

In contrast to Steven's and Larry's testimony regarding Gertrude's confusion, Fugate testified that he did investigate Gertrude's mental status. Fugate did not ask Steven, Larry, and Loretta about Gertrude's mental state from 2007 until her death because, due to their lack of contact with Gertrude, they would not have had any knowledge of her mental status. Additionally, Fugate also did not speak with Gertrude's treating physician to ascertain her state of mind in 2007 or any time thereafter. Instead, in his investigation of Gertrude's mental status, Fugate relied on his personal contacts with Gertrude and his review of Gertrude's medical records.

Fugate testified that he met with Gertrude many times over the years, sometimes once per year, sometimes three times per year, and that he would speak to her on the telephone two or three times per year. According to Fugate, from the time that he began representing Gertrude and her husband in the late 1980's or early 1990's until December 2008, Gertrude was always able to clearly express herself, was able to express a reason for her actions, was always able to identify

her children, was always able to identify the nature and extent of her property, was always able to understand the nature of any document that Fugate prepared for her, and was able to understand the consequences of signing those documents.

According to Fugate, Gertrude clearly expressed her intentions regarding her property and her children at the time that Fugate prepared Gertrude's will in April 1998; however, Gertrude's intentions changed by February 2005, due to her children's failure to visit her after she broke her hip. Gertrude expressed her intention to change the beneficiaries on the CD's and stated that she was going to take care of it at the bank. Fugate later learned that Gertrude did change the beneficiaries of the CD's as she had indicated that she was going to do. Fugate testified that he did not need to inquire of Steven, Larry, or Loretta as to the 2005 change in beneficiaries of the CD's in his telephone conversation with Gertrude, because "she was pretty clear as to what she was going to do and why she was going to do it."

Fugate further testified that in October 2010, he reviewed Gertrude's medical records dating back to 1996, making "a normal, customary effort in reviewing [Gertrude's] medical records based upon the facts and circumstances involved in this case." A portion of Gertrude's medical records, exhibits 19 through 22, were admitted for the limited purpose of being considered in conjunction with Fugate's testimony regarding his review of Gertrude's medical records.

Based upon his review of Gertrude's medical records, Fugate testified that October 2009 was the first time that there was any indication from a medical provider that Gertrude suffered from dementia, when Gertrude's primary physician first suggested a "mini mental" examination for dementia. Prior references to "dementia" contained in Gertrude's medical records resulted from an apparent June 6, 2007, statement by Gary to a nurse concerning "dementia" which was picked up by hospital personnel as history and carried forward in subsequent hospital records. Further, Fugate testified that it was apparent to him, from his own conversations and contact with Gertrude, and reviewing the 2007 statement regarding dementia in the context of the history of Gertrude's medical records, that Gertrude's dementia became more significant beginning in October 2009; however, Fugate did not find any actual diagnosis of dementia contained in Gertrude's medical records that he reviewed. Fugate testified that Gertrude's reluctance to go to a doctor and her reluctance to go to a nursing home as reflected in her medical records was consistent with his experience with her over the years, including her capacity to be noncompliant and uncooperative.

Fugate did not have a conversation with Gary concerning the contents of that medical record, specifically the 2007 statement that Gary thought Gertrude had dementia, and did not interview Gary about his concerns regarding Gertrude's state of mind. At trial, Gary disputed the contents of the medical records, testifying that Gertrude did not have dementia and that he did not tell Gertrude's doctors or health care providers that she had dementia.

### 5. CONCERNS REGARDING GARY

Steven testified that he has known Gary since 1949 and that he has known Gary to have problems with his mental capacity. According to Steven, Gary made representations during his March 2011 deposition that caused Steven to question Gary's mental capacity. Although the county court excluded this testimony on the grounds of nonrelevance, the appellants made an

offer of proof that at his deposition in March 2011, Gary testified that while he was incarcerated in North Platte, Nebraska, in 1984, he saw numerous celebrities such as "Bobby Kennedy and Sirhan Sirhan" alive, even though the persons were deceased.

Steven testified that he talked with Gary about Gary's poor care of Gertrude and about the possibility of placing Gertrude in a skilled nursing facility, but he did not talk to anyone outside of the family about the issue. Steven further admitted that he was aware that Gary had home health nurses coming to the home multiple times per week. Further, Steven testified that his concerns prompted him to call adult protective services in December 2008, but he is unsure of what transpired after his call because he was unable to obtain information over the telephone; he admitted that he did not come to Nebraska to have protective proceedings started. Steven also admitted that he never sought to obtain power of attorney himself, because he thought it would be easier for Loretta to be Gertrude's power of attorney, but she was not interested. Steven's testimony that Gary told him that he would not place Gertrude in a nursing home because he did not want to spend the money was excluded as hearsay.

Steven also expressed his concerns to Fugate about Gary's being Gertrude's power of attorney based on Gary's and Gertrude's mental abilities. Steven testified that it appeared that Gary used Gertrude's power of attorney to "pretty much [sign] the estate over to himself." Specifically, Steven claimed that Gary used the power of attorney to sell Gertrude's lake house property and then sign one-half of the proceeds over to himself resulting in the proceeds not being divided as directed in Gertrude's will. Steven also became concerned when he learned, at the time of the probate of Gertrude's estate, that the beneficiaries of the CD's had been changed, and he believed that Gary had used Gertrude's power of attorney to make himself the sole beneficiary of the money market account.

### 6. CONCERNS ABOUT FUGATE AS PERSONAL REPRESENTATIVE

The concerns expressed by Steven to Fugate were that Gary was not competent to act as Gertrude's power of attorney and had used the power of attorney to transfer assets to himself in contravention to the directives contained in Gertrude's will. According to Steven, despite the fact that he expressed his concerns to Fugate, Fugate did not respond to his concerns, failed to investigate, did not freeze assets despite Steven's request to do so until issues regarding Gertrude's estate could be resolved, and failed to act to ensure that Gary did not abuse Gertrude's power of attorney.

However, Steven admitted that he received a copy of Gertrude's will within a few days of requesting it from Fugate's office, Fugate informed him that there was a date by which claims or debts against the estate needed to be filed, and he received a copy of the inventory identifying all of the assets of Gertrude's estate. Steven further admitted that Fugate responded to his concerns in May 2010 regarding the inclusion or exclusion of assets in Gertrude's estate and the distribution of Gertrude's estate and that Fugate also expressed a willingness to answer any questions regarding his position as personal representative concerning the inventory and schedule distribution and operation of Gertrude's will.

Contrary to Steven's testimony, Fugate testified that to the best of his recollection, he responded to each of the e-mails he received from Steven and responded fully to inquiries by the parties' attorney prior to the objection being filed. Fugate further testified that he investigated the

concerns raised regarding the annuity and the sale of the lake house property proceeds that were deposited into the First National Bank investment agency account. Additionally, Fugate inquired at banks where Gertrude had accounts and requested information concerning those accounts and balances. Further, Fugate testified that, based upon his investigation and in his opinion as personal representative, he determined Gary had not made any gifts to himself, or to anyone else, using Gertrude's power of attorney.

Fugate admitted that he did not consult Steven regarding either the sale of the lake house property or the 2005 change of beneficiaries on the CD's because it was Fugate's understanding Steven had not seen Gertrude for some time and was not involved in her ongoing affairs and that he did not consult with Steven regarding the real estate transaction because he had not handled the transaction for Gertrude. Further, Fugate believed that information he obtained from the bank was more accurate with respect to the CD's, and he had also had a specific conversation with Gertrude regarding why she changed the beneficiaries on the CD's.

### 7. COUNTY COURT'S ORDER

The county court denied both the removal of the personal representative and the appointment of a special administrator, and no monetary judgment was awarded. Specifically, the county court found that Fugate complied with the prudent investor rule; there was no compelling evidence to support the allegation that he failed to manage the estate assets in a prudent manner; there was no evidence that he failed to reasonably and promptly investigate allegations raised by Steven, Larry, and Loretta; and there was no convincing evidence to suggest that he failed to perform any fiduciary duty owed to the estate or that he misrepresented any facts, material or otherwise, in any proceeding leading up to his appointment. Thus, the court found that the removal of Fugate as personal representative was not warranted or in the best interests of Gertrude's estate. The court further found that the record was "devoid of undeniable facts that establish, by a preponderance, that the Personal Representative herein engaged in fraud or collusion, or has a conflict of interest or is unable to act" and there was no reason to appoint a special administrator.

A supersedeas bond hearing was held in January 2013, and the county court set the supersedeas bond at $15,000. The appellants posted the docket fee and the supersedeas bond and timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

On appeal, the appellants' assignments of error, consolidated and restated, are that the county court erred (1) in excluding Steven's testimony regarding his reasons for questioning Gary's mental competence and motives surrounding Gary's handling of Gertrude's financial affairs and (2) in denying their request to remove the personal representative and appoint a special administrator.

The appellants have also assigned as error that the county court erred in setting a supersedeas bond of $15,000; however, the appellants did not address this assigned error in the argument portion of their brief. In order to be considered by an appellate court, alleged errors must be both specifically assigned and specifically argued in the brief of the party asserting the error. *State v. Kays*, 21 Neb. App. 376, 838 N.W.2d 366 (2013); *Dowd Grain Co. v. County of*

*Sarpy*, 19 Neb. App. 550, 810 N.W.2d 182 (2012). Since this assignment of error was not addressed in the argument section of the appellants' brief, we decline to consider it.

We also note that in the appellants' reply brief, they have requested that this court address the issue of the appellants' standing to bring an action in district court to pursue recovery of estate assets where the personal representative has refused to act. However, this issue is not currently before this court within the context of this appeal and the appellants are seeking an advisory opinion. In the absence of an actual case or controversy requiring judicial resolution, it is not the function of our court to render a judgment that is merely advisory. *In re Interest of Shaleia M.*, 283 Neb. 609, 812 N.W.2d 277 (2012). Furthermore, an issue not presented to or decided on by the trial court is not an appropriate issue for consideration on appeal. *DMK Biodiesel v. McCoy*, 285 Neb. 974, 830 N.W.2d 490 (2013). An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Holdsworth v. Greenwood Farmers Cooperative*, 286 Neb. 49, 835 N.W.2d 30 (2013). Therefore, we decline to address this issue.

We further note that Gary's brief, although an appellee's brief, assigns as error that the county court abused its discretion in admitting exhibits 19 through 22 into evidence over objection. The Nebraska Supreme Court has set forth that if affirmative relief is to be obtained by an appellee, a cross-appeal must be properly designated pursuant to Neb. Ct. R. § 2-109(D)(4) (rev. 2012). See *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999). Since Gary has not complied with the rules requiring that his brief contain a designation identifying it as containing a cross-appeal, we decline to waive the rules on his behalf and do not consider the assignment of error contained in his brief.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *Id.*

A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Conley v. Brazer*, 278 Neb. 508, 772 N.W.2d 545 (2009).

The removal of a personal representative is not an equity question. *In re Estate of Robb*, 21 Neb. App. 429, 839 N.W.2d 368 (2013). See *In re Estate of Krumwiede*, 264 Neb. 378, 647 N.W.2d 625 (2002). The removal of a personal representative is reviewed for error appearing on the record. *In re Estate of Robb, supra*. See *In re Estate of Webb*, 20 Neb. App. 12, 817 N.W.2d 304 (2012).

Likewise, a trial court's decision whether to appoint a special administrator is not a question of equity. *In re Estate of Robb, supra*. See *In re Estate of Evans*, 20 Neb. App. 602, 827 N.W.2d 314 (2013) (noting that trial court erred in ordering removal of appellant as personal representative rather than making independent determination). Therefore, appointment of a special administrator is reviewed for error appearing on the record. *In re Estate of Robb, supra*.

- 10 -

When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Trust of Rosenberg*, 273 Neb. 59, 727 N.W.2d 430 (2007); *In re Trust Created by Crawford*, 20 Neb. App. 502, 826 N.W.2d 284 (2013). The probate court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. *In re Estate of Muncillo*, 280 Neb. 669, 789 N.W.2d 37 (2010).

## V. ANALYSIS

### 1. EXCLUSION OF EVIDENCE

The appellants' first assignment of error is that the county court erred in excluding relevant, nonhearsay testimony by Steven regarding his reasons for questioning Gary's mental competence to act as Gertrude's power of attorney. Specifically, the appellants contend that (a) the county court erred in excluding, as hearsay, Steven's testimony that Gary told him that he would not put Gertrude in a nursing home because Gary did not want to spend the money and (b) in excluding, on the grounds of nonrelevance, Steven's testimony regarding his recent concerns about Gary's mental health.

### (a) Steven's Testimony Regarding Gary's Motives

With regard to the appellants' claim that the county court erred in excluding, on hearsay grounds, Steven's testimony that Gary told him that he would not put Gertrude in a nursing home because he did not want to spend the money, the appellants contend that this testimony is nonhearsay because Gary's statement constituted "words of legal significance" or a "verbal act" which showed Gary's treatment of Gertrude's money as his own. Brief for appellants at 30.

Verbal acts are not hearsay, because their significance rests on the simple fact that the words were said, regardless of their truth. *Werner v. County of Platte*, 284 Neb. 899, 824 N.W.2d 38 (2012). A verbal act is an utterance constituting an operative fact which gives rise to legal consequences. *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986). Stated another way, a verbal act is a statement that has legal significance, i.e., it brings about a legal consequence simply because it was spoken. *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011). Thus, where testimony is offered to establish the existence of a statement rather than to prove the truth of the statement, the hearsay rule does not apply. *Id.*; *Alliance Nat. Bank v. State Surety Co., supra*.

We do not agree that Gary's statement was a verbal act. Typical examples of verbal acts are "'words of a contract, words establishing agency, slanderous words, [and] sexually harassing words.'" *Werner v. County of Platte*, 284 Neb. at 911, 824 N.W.2d at 52 (quoting R. Collin Mangrum, Mangrum on Nebraska Evidence 762 (2012)). In those cases, all that matters is that the words were said, not whether the words were true. In contrast, in the instant case, Gary's statement was not a statement that would bring about a legal consequence simply because it was spoken. As such, it was not a verbal act and was properly excluded by the county court as hearsay.

The appellants next contend that the county court erred in excluding Steven's testimony regarding his concerns about Gary's mental health. Although the county court excluded the reasons for Steven's concerns about Gary's mental health on the grounds of nonrelevance, the appellants made an offer of proof that, at his deposition in March 2011, Gary testified that while he was incarcerated in North Platte in 1984, he saw numerous celebrities such as "Bobby Kennedy and Sirhan Sirhan" alive, even though the persons were deceased. The appellants contend that this testimony is relevant because it tends to make more or less likely a fact of consequence, specifically, Steven's reason for questioning Gary's actions enough to bring his concerns to Fugate's attention and the effect that hearing those complaints should have had on Fugate.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006); *State v. Schmidt*, 16 Neb. App. 741, 750 N.W.2d 390 (2008). Evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006); *State v. Schmidt, supra*.

The issues before the county court were whether Fugate, as Gertrude's personal representative, should be removed and a special administrator appointed. Statements made by Gary in a deposition taken over a year after his mother's death, which related to alleged visions he had over 25 years earlier, simply were not relevant to the issues before the county court, which were whether the personal representative should be removed and a special administrator appointed, and were properly excluded by the county court.

## 2. Denial of Request to Remove Personal Representative and Appoint Special Administrator

Next, the appellants contend that the county court erred in denying their request to remove Fugate as the personal representative and appoint a special administrator.

Taken together, Neb. Rev. Stat. § 30-2454 (Reissue 2008) and Neb. Rev. Stat. § 30-2457 (Reissue 2008) set forth the procedure by which to suspend and remove a personal representative and appoint a special administrator. See *In re Estate of Cooper*, 275 Neb. 322, 746 N.W.2d 663 (2008). A court may remove a personal representative from an estate if

> removal would be in the best interests of the estate, or if it is shown that a personal representative . . . intentionally misrepresented material facts in the proceedings leading to his appointment, . . . has disregarded an order of the court, has become incapable of discharging the duties of his office, or has mismanaged the estate or failed to perform any duty pertaining to the office.

§ 30-2454(b). See, also, *In re Estate of Seidler*, 241 Neb. 402, 490 N.W.2d 453 (1992); *In re Estate of Robb*, 21 Neb. App. 429, 839 N.W.2d 368 (2013). Pursuant to § 30-2457(2), a special administrator may be appointed

in a formal proceeding by order of the court on the petition of any interested person and finding, after notice and hearing, that appointment is necessary to preserve the estate or to secure its proper administration including its administration in circumstances where a general personal representative cannot or should not act. If it appears to the court that an emergency exists, appointment may be ordered without notice.

### (a) Denial of Request to Remove Fugate
### as Personal Representative

In considering whether the county court erred in failing to remove Fugate as Gertrude's personal representative, we must address (i) the scope of the duties of a fiduciary personal representative with special skills as an attorney and (ii) whether Fugate neglected at least one fiduciary or professional duty within that scope to the extent that his removal was warranted.

#### *(i) Scope of Duties of Fiduciary*
#### *Personal Representative*

A personal representative is a fiduciary who must comply with the prudent investor rule set forth in Neb. Rev. Stat §§ 30-3883 to 30-3889 (Reissue 2008). Neb. Rev. Stat. § 30-2464(a) (Reissue 2008). The prudent investor rule mandates that a personal representative who is a fiduciary shall exercise reasonable care, skill, and caution in managing estate assets. § 30-3884(a). The prudent investor rule also requires a personal representative to "make a reasonable effort to verify facts relevant to the investment and management of trust assets." § 30-3884(d). Compliance with the prudent investor rule is determined in light of the facts and circumstances at the time of the personal representative's decision or action and not by hindsight. See § 30-3887.

Additionally, a personal representative is under a duty to settle and distribute the estate of the decedent in accordance with the terms of any probated and effective will and the probate code, and as expeditiously and efficiently as is consistent with the best interests of the estate. § 30-2464(a). The personal representative shall use the authority conferred upon him or her by the probate code; the terms of the will, if any; and any order in proceedings to which he or she is party for the best interests of successors to the estate. *Id*.

#### *(ii) Failure to Perform Duties Pertaining*
#### *to Office of Personal Representative*

The appellants' allegations regarding the county court's error in denying their request to remove Fugate as personal representative because he mismanaged Gertrude's estate or failed to perform the following duties pertaining to his office as personal representative relate to his alleged failures in three main respects: (a) failing to make a reasonable inquiry into Gertrude's mental faculties involving her assets; (b) failing to conduct an investigation or otherwise respond to the appellants' concerns regarding Gary's alleged misuse of Gertrude's power of attorney, including failing to pursue recovery of the funds contained in the Symetra annuity; and (c) failing to conduct an investigation or otherwise respond to the appellants' concerns regarding Gary's alleged misuse of Gertrude's power of attorney, regarding the sale of the lake house property and the proceeds which were placed in the First National Bank investment agency

account, including failing to pursue recovery of those funds. Implicit in our consideration of the appellant's allegations of Fugate's deficient performance in these areas, we consider whether Fugate complied with the prudent investor rule, whether he managed Gertrude's estate assets in a prudent manner, and whether he failed to perform fiduciary duties owed to Gertrude's estate.

<u>a. Failure to Make Reasonable Inquiry</u>
<u>Into Gertrude's Mental Faculties</u>

We first address the appellants' allegation that the county court erred in denying their request to remove Fugate as personal representative because he failed to make a reasonable inquiry into Gertrude's mental faculties involving her assets. The appellants specifically identify as important the dates of February 2005, when Gertrude changed the POD beneficiaries of the CD's; December 2008, when Gertrude signed her power of attorney; and January 2009, when Gertrude opened the First National Bank investment agency account, naming herself and Gary as account owners, and deposited the proceeds from the sale of the lake house therein. The appellants complain that Fugate failed to make reasonable inquiry of legally significant facts affecting the estate administration and failed to use his special attorney skills when he did not interview nurses, doctors, Steven, or Gary about Gertrude's mental faculties despite Fugate's knowledge that Gertrude's medical records mentioned dementia.

We agree that the record reflects that Fugate did not ask Steven, Larry, and Loretta about Gertrude's mental state. However, Fugate testified that he did not do so because, due to their lack of contact with Gertrude, they would not have had any knowledge of her mental status during the relevant time periods. Additionally, although the appellants correctly point out that Fugate did not interview Gertrude's treating physician, he did review Gertrude's medical records dating back to 1996, as well as relying on his own personal contacts with Gertrude. In making his assessment of Gertrude's mental state, Fugate noted that Gertrude's medical records contained no medical diagnosis of dementia until October 2009, when Gertrude's primary physician first suggested a "mini mental" examination for dementia. This occurred 4 years after the change in beneficiaries on the CD's and nearly a year after Gertrude's execution of the power of attorney.

Further, the evidence at trial established that Gertrude had the mental capacity to conduct her own affairs. With regard to her changing the beneficiaries of the CD's in February 2005, Fugate testified that Gertrude had expressed in conversations with him in early February 2005, that she was unhappy with her children, other than Gary, because they had not visited her after she broke her hip in 2005, even after she requested that they do so, which prompted her to remove the children as POD beneficiaries of the CD's. At that time, Fugate advised Gertrude that since there was a specific provision in her will concerning the CD's, that they prepare a codicil to remove that provision; however, Gertrude indicated that she was going to take care of the matter herself at the bank. Fugate further testified that he did not make inquiries from Steven, Larry, or Loretta regarding the 2005 change of beneficiaries because of his telephone conversation with Gertrude wherein she was "pretty clear as to what she was going to do and why she was going to do it." Thus, the evidence established that it was Gertrude's desire to change the beneficiaries of the CD's and that she had a reason for doing so.

With regard to Gertrude's execution of her power of attorney in December 2008, the appellants argue that Gertrude lacked the mental capacity to execute the power of attorney;

however, there is clearly sufficient evidence at trial to establish just the opposite. The evidence established that Gertrude was able to articulate why she wanted a durable power of attorney and, on the day she signed the power of attorney, she was oriented as to time, person, and place. She asked appropriate questions and indicated that she understood the purpose and effect of the power of attorney. According to Fugate, from the time that he began representing Gertrude and her husband in the late 1980's or early 1990's until December 2008, Gertrude was always able to clearly express herself, was able to express a reason for her actions, was always able to identify her children, was always able to identify the nature and extent of her property, was always able to understand the nature of any document that Fugate prepared for her, and was able to understand the consequences of signing those documents.

Finally, with regard to Gertrude's opening of the First National Bank investment agency account in January 2009, naming herself and Gary as account owners, the evidence showed that Fugate investigated the opening of the account and that First National Bank trust department personnel were satisfied that there was nothing unusual or suspicious in the opening or use of Gertrude's investment agency account.

### b. CD's/Symetra Annuity

Next, we address the appellants' claim that the county court erred in denying their request to remove Fugate as personal representative because he failed to conduct an investigation or otherwise respond to their concerns regarding Gary's alleged misuse of Gertrude's power of attorney, including failing to pursue recovery of the funds contained in the Symetra annuity.

Despite the appellants' claims to the contrary, after Fugate was advised that the appellants had concerns about Gary's mental capacity to act as Gertrude's power of attorney and Gary's actions, specifically concerning the CD's which were later converted into the Symetra annuity, Fugate conducted an investigation obtaining information related to the CD's and Symetra annuity directly from the banks involved. Fugate's investigation of the CD's and Symetra annuity showed that on February 23, 2005, Gertrude removed Steven's and Larry's names as POD beneficiaries from two of her CD's and made Gary POD beneficiary on all three CD's, which actions were in accordance with her expressed intentions. This occurred years prior to the existence of Gertrude's power of attorney, so obviously the power of attorney was not involved in these transactions.

Fugate further determined that in October 2008, Gertrude opened a money market account and placed the money from the CD's into that account, continuing herself as the account owner and Gary as POD beneficiary. In December 2008, Gary acted as Gertrude's attorney-in-fact in signing the Symetra annuity application and documents required to move money from Gertrude's money market account to a Symetra annuity. The Symetra annuity application did not change the ownership of the monies involved; instead, they merely changed the asset form, continuing the same ownership and beneficiary designation Gertrude had put in place in February 2005. Gertrude's annuity paid a guaranteed 6.85 percent for 1 year with a guaranteed 2 percent thereafter, which Fugate testified was more interest than a money market account was paying at the time. There was no misuse of Gertrude's power of attorney to sign documents to facilitate Gertrude's desire to move her money from a low-paying money market

account into a higher-paying annuity in which the ownership/beneficiary designations remained unchanged.

We also note that in the appellants' brief, they contend that in December 2009, there was a $21,500 withdrawal from Gertrude's money market account that is unaccounted for; however, the appellants did not raise this issue before the county court. An issue not presented to nor decided by the trial court is not an appropriate issue for consideration on appeal. *DMK Biodiesel v. McCoy*, 285 Neb. 974, 830 N.W.2d 490 (2013).

### (c) Lake House Property

Finally, we address the appellants' allegation that the county court erred in denying their request to remove Fugate as personal representative because he failed to conduct an investigation or otherwise respond to the appellants' concerns regarding Gary's alleged misuse of Gertrude's power of attorney, including use of the power of attorney in the sale of the lake house property, the investment of the proceeds from that sale, and his failure to pursue recovery of those funds from the First National Bank investment agency account.

After Fugate was advised that the appellants had concerns about Gary's mental capacity to act as Gertrude's power of attorney and his actions concerning the sale of the lake house and the investment of those proceeds, Fugate conducted an investigation and determined that Gary had acted as Gertrude's attorney-in-fact to sign the contract for the sale of the lake house property on December 18, 2008, and to sign the warranty deed to complete the sale of the lake house property on January 13, 2009. The power of attorney was not used to establish the account at First National Bank where the proceeds from the sale of the lake house property were deposited.

Fugate was aware, from having reviewed the deed, that Gertrude was represented by independent counsel who negotiated the sale of the lake house property and prepared the contract for the sale on her behalf. The contract contained terms of sale that Gertrude had described to Fugate in the van when she executed her power of attorney, which conversation occurred several days prior to the sale of the lake house property. Additionally, Fugate testified that Gertrude likely received a premium price for the lake house property and that the terms of the sale included the reservation clause which fulfilled Gertrude's desire to remain in her own home until her death. There was no misuse of Gertrude's power of attorney by Gary relating to the sale of the lake house property in signing documents for Gertrude which were prepared by an attorney hired by Gertrude to sell her property for a premium price and containing a clause which would meet Gertrude's desire to live in the property for the rest of her life and where the terms of the contract were consistent with Gertrude's intentions as she had personally expressed them to Fugate on December 16, 2008.

The appellants also complain that Fugate did not question Gary about the circumstances surrounding the opening of the First National Bank investment agency account where Gertrude deposited the proceeds from the sale of the lake house property; however, Fugate specifically testified that he did not question Gary about the opening of the First National Bank investment agency account because he was interested in independent evidence of how the account was set up which was best provided by bank personnel. Fugate determined that Gertrude's power of attorney had not been used to open the investment agency account; the account was set up with

Gertrude's signature, which Fugate recognized as Gertrude's handwriting. Further, First National Bank trust department personnel were satisfied that there was nothing unusual or suspicious in the opening or use of Gertrude's investment agency account. Additionally, Fugate testified that the disposition of the investment agency account was consistent with Gertrude's earlier expressions of displeasure with her children, other than Gary, which had prompted her to remove Steven and Larry as POD beneficiaries of the CD's in 2005. Thus, upon his investigation, Fugate did not find evidence of any wrongdoing by Gary regarding the sale of the lake house property or investment of the proceeds therefrom.

Although the appellants complain that Fugate did not commence an action to recover the nonprobate half of the investment agency account, Fugate monitored the investment agency account and took steps to freeze not only the probate assets in that account, but also the nonprobate assets, pending a final order of complete settlement approving the schedule of distribution.

Furthermore, upon Gertrude's sale of the lake house property a year prior to her death, the specific devise of the lake house property to Larry and Gary was adeemed by implied revocation. The term "ademption" refers to "'[t]he destruction or extinction of a testamentary gift by reason of a bequeathed asset's ceasing to be part of the estate at the time of the testator's death. . . .'" *In re Estate of Bauer*, 270 Neb. 91, 95, 700 N.W.2d 572, 577 (2005), quoting Black's Law Dictionary 42 (8th ed. 2004). There are generally two types of ademption, one involving satisfaction of a devise and the other involving an implied revocation thereof. *Id.*; *In re Estate of Poach*, 257 Neb. 663, 600 N.W.2d 172 (1999); *Reed v. McClow*, 205 Neb. 739, 290 N.W.2d 186 (1980). An ademption by satisfaction occurs when a testator, prior to death, conveys to the beneficiary the property that was specifically devised to that beneficiary. *In re Estate of Bauer, supra*. See Neb. Rev. Stat. § 30-2350 (Reissue 2008). Ademption by implied revocation results from an "'"act by which a devise . . . of specific property becomes inoperative by the sale or extinction of the property *during the testator's lifetime*."'" *In re Estate of Bauer*, 270 Neb. at 95, 700 N.W.2d at 577, quoting *In re Estate of Poach, supra* (emphasis in original). Accord *Reed v. McClow, supra*.

The doctrine of ademption by implied revocation is "'"based upon a presumed alteration of intention arising from the changed condition and circumstances of the testator, or on the presumption that the will would have been different had it been executed under the altered circumstances."'" *In re Estate of Bauer*, 270 Neb. at 95-96, 700 N.W.2d at 577, quoting *In re Estate of Poach, supra*. Accord *Baacke v. Baacke*, 50 Neb. 18, 69 N.W. 303 (1896). "To illustrate this principle, [the Nebraska Supreme Court] wrote in *Baacke* that a 'sale of the entire estate devised' will have the effect of revocation because 'the will cannot thereafter take effect on it.'" *In re Estate of Bauer*, 270 Neb. at 96, 700 N.W.2d at 577, quoting *Baacke v. Baacke, supra*. Further, in *In re Estate of Kulp*, 122 Neb. 157, 239 N.W. 636 (1931), the court held that "specific legacies which were to be paid from the sale of certain real property after the death of the testatrix were adeemed and rendered inoperative by the sale of such property by the testatrix during her lifetime." *In re Estate of Bauer*, 270 Neb. at 96, 700 N.W.2d at 577. The court rejected an argument that the legacies should be satisfied from the proceeds of such sale, stating that such distribution "'would be, in effect, making a new will.'" *Id.*, quoting *In re Estate of Kulp, supra*.

Gertrude's decision to sell the lake house property during her lifetime resulted in that property no longer being a part of her estate at the time of her death, and the specific devise in her will relating to that property was inoperative. Gertrude's sale of the lake house property, over a year prior to her death, resulted in the specific devise of the lake house property to Larry and Gary being adeemed by implied revocation. Further, the evidence clearly established that after the sale of the lake house property, Gertrude deposited 100 percent of the proceeds into the investment agency account listing Gertrude and Gary as account owners. As such, one-half of the account was treated as probate and was distributed accordingly and one-half of the account was nonprobate, belonging to Gary.

## 3. SUMMARY

Stated simply, Fugate investigated the concerns raised by the appellants by obtaining information related to the CD's, money market account, investment agency account, and annuity directly from the banks involved. Fugate obtained and reviewed Gertrude's medical records going back to 1996. He reviewed the real estate documents related to the sale of the lake house property and spoke to Clough, who was the attorney who had represented Gertrude in that transaction. Fugate spoke to Gary's attorney; spoke to or exchanged e-mails with Steven, Larry, and/or Loretta; and provided documents requested by them.

After his investigation, Fugate concluded that Gertrude had capacity to change the beneficiaries of the CD's and the capacity to execute the power of attorney. Additionally, Fugate did not find evidence of any wrongdoing by Gary and found that Gary did not use Gertrude's power of attorney to gift himself any of Gertrude's property, and thus, he declined to pursue an action against Gary. Fugate further concluded, after his investigation, that the funds in the Symetra annuity account (traced from the three CD's) and Gary's half of the investment agency account were nonprobate assets and declined to pursue recovery of those assets.

A court may remove a personal representative from an estate if "removal would be in the best interests of the estate, or if it is shown that a personal representative . . . has mismanaged the estate or failed to perform any duty pertaining to the office." § 30-2454(b). There has been no evidence that it would be in the best interests of Gertrude's estate to remove Fugate as personal representative nor has there been any evidence that Fugate failed to perform any duty pertaining to the office of personal representative. Consequently, the county court did not err in denying the appellants' request to remove Fugate as personal representative of Gertrude's estate.

The appellants claim that the county court erred in denying their request to appoint a special administrator based upon the county court's findings that there was no evidence that the personal representative failed in his duties.

A special administrator may be appointed "in a formal proceeding by order of the court on the petition of any interested person and finding, after notice and hearing, that appointment is necessary to preserve the estate or to secure its proper administration." § 30-2457(2). A special administrator should not be appointed every time a potential beneficiary disagrees with the personal representative's administration decisions, absent some showing that the personal representative is not lawfully fulfilling his or her duties under the code. *In re Estate of Muncillo*, 280 Neb. 669, 789 N.W.2d 37 (2010). Such a showing, at minimum, necessitates an allegation that the personal representative is perpetrating fraud, has colluded with another to deprive the

estate of a potential asset, is conflicted to properly administer the estate, or cannot act to preserve the estate, or the existence of some other equitable circumstance, plus some evidence of the personal representative's alleged dereliction of duty. *Id.* A putative beneficiary's disagreement with a personal representative over the proper course of action for a potential claim does not necessitate the appointment of a special administrator, absent a showing of fraud, collusion, conflict of interest, inability to act, or other special equitable circumstance. *Id.* Absent such a showing, the appointment of a special administrator is not "necessary to preserve the estate" under § 30-2457(2).

In the instant case, the appellants did not produce any evidence as to any of the aforementioned circumstances; therefore, we cannot say that the county court erred in denying the request for an appointment of a special administrator.

## VI. CONCLUSION

Having found that the county court properly denied the appellants' request to remove the personal representative and appoint a special administrator, we affirm the order of the county court.

AFFIRMED.

PIRTLE, Judge, participating on briefs.

- 19 -